UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN (REX) SANDERS, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>BAY AREA AIR QUALITY MANAGEMENT DISTRICT,<br><br>       Defendant. | Case No. 23-cv-04416-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 166 |

In this consolidated case, Plaintiffs Stephen (Rex) Sanders and Terri Levels brought suit against Defendant Bay Area Air Quality Management District ("the District"), asserting ten total causes of action arising from their employment at the District. Their claims comprise discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), failure to prevent discrimination in violation of FEHA, hostile work environment in violation of FEHA, and retaliation in violation of FEHA and Title VII of the Civil Rights Act of 1964. (Dkt. No. 103.) The District now moves for summary judgment on all claims. (Dkt. No. 166.) For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART**. This order assumes the reader's familiarity with the facts of the case, the applicable legal standards, and the parties' arguments.

*Sanders' Gender Identity Discrimination Claim.* FEHA discrimination claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*,

1

411 U.S. 792 (1973). *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). Under *McDonnell Douglas*, plaintiffs have the burden of establishing a prima facie case of discrimination. 411 U.S. at 802. "To establish a prima facie discrimination claim under FEHA, a plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for his position; (3) he experienced an adverse employment action; and (4) other similarly situated employees outside of the protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 800–01 (N.D. Cal. 2015) (citing *Slatkin v. Univ. of Redlands*, 88 Cal. App. 4th 1147, 1158, (2001)). Once a plaintiff has established their prima facie case, the burden shifts to the defendant to articulate a nondiscriminatory reason for the allegedly discriminatory conduct. *McDonnell Douglas*, 411 U.S. at 802. If the defendant can articulate such a reason, the burden shifts back to the plaintiff to demonstrate that the defendant's nondiscriminatory reason was pretextual. *Id.* at 804.

Summary judgment is proper as to Sanders' claim that he was discriminated against because of his gender identity.[1] There is no evidence in the record suggesting that any decisionmaker involved in any action against Sanders had knowledge of Sanders' nonbinary gender identity and thus took an adverse action against him on that basis. At the hearing on the summary judgment motion, Plaintiffs' counsel pointed only to Sanders' statement in his declaration that he raised several complaints about the District's "heteronormative work environment," his statement during his deposition that the dress code required by then-Air Pollution Control Officer Jack Broadbent (who Sanders previously reported to directly) was "binary gendered," and a statement in the employee grievance of Levels (who previously reported to Sanders) that Broadbent ignored Sanders' complaints and "instead perpetuated a heteronormative, binary office culture." (Dkt. Nos. 174-2 ("Sanders Decl.") at ¶ 14; 171-1

---

[1] Sanders' counsel indicates that Sanders uses he/his/him pronouns, so this order uses those pronouns in reference to Sanders.

("Sanders Dep.") at 137; 171-4 ("Levels Dep.") at 109.)[2]  This, however, is insufficient to give rise to a material dispute of fact that then-Air Pollution Control Officer Sharon Landers knew of Sanders' nonbinary gender identity when she terminated him, or that Broadbent or then-Acting Chief Administrative Officer John Chiladakis (who initially was Sanders' direct report but then assumed Sanders' position as CAO of the District during his medical leave) was aware of that identity when they discussed Sanders' performance with Landers.  Complaints about a heteronormative work environment do not necessarily disclose the complainant's gender identity, and the assertions regarding Broadbent's dress code and the office culture he perpetuated do not entail that Broadbent knew that Sanders was nonbinary.  Accordingly, there is no material dispute of fact as to Landers' knowledge, let alone Broadbent and Chiladakis'.  *See Zaman v. Kelly Servs., Inc.*, No. 15-cv-04601-HRL, 2016 WL 5462706, at *5 (N.D. Cal. Sept. 28, 2016) (citing *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236 (1997)).  Sanders has identified no other circumstantial evidence that would support a reasonable inference that he suffered an adverse employment action due to his nonbinary gender identity.  Summary judgment is therefore **GRANTED** in favor of the District as to Sanders' gender-identity discrimination claim.

*Sanders' Sexual Orientation Discrimination and Levels' Race and Sex Discrimination Claims.*  Genuine disputes of material fact otherwise preclude summary judgment on Sanders' sexual orientation discrimination claim and Levels' race and sex discrimination claims, as sufficient evidence has been presented to support prima facie discrimination claims pursuant to the standard set forth above, and to support a determination that the District's nondiscriminatory reason for its actions was pretextual.

The parties do not dispute that Sanders was "openly gay" while employed at the District and that Broadbent, Chiladakis, and Landers knew that he was gay.  (Dkt. No. 166 ("Motion") at 28.)  Nor do they dispute Levels' race and gender identity, and the District's knowledge of both.

---

[2] All citations to page numbers in filings on the docket refer to ECF page numbers.

The parties similarly do not dispute that Sanders and Levels were qualified for the positions they held at the District.

While the District concedes that Sanders' and Levels' terminations constituted adverse employment actions, it asserts that the remaining issues raised by Sanders and Levels do not constitute adverse actions. In the discrimination context, an adverse employment action is one that "materially affect[ed] the terms, conditions, or privileges of the plaintiff's employment," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1061 (N.D. Cal. 2011) (citation omitted). Undeserved negative performance reviews can also constitute an adverse employment decision, so long as such reviews are sufficiently final. *Brooks v. City of San Mateo*, 229 F.3d 917, 929–30 (9th Cir. 2000). By contrast, "declining to hold a job open for an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions." *Id*. at 928–29. Some, though not all, of the actions challenged by Sanders and Levels beyond their terminations rise to the level of "adverse employment actions."

The following actions, though offensive, did not materially affect the terms and conditions of Sanders' and Levels' employment and thus do not constitute adverse employment actions:

- Derogatory statements, false performance accusations, and rumors regarding Sanders and Levels. Outside of the audit, there is no evidence that these occurred in the job reference or performance review contexts, thereby affecting the terms of their employment. *Id*.; *see also Light v. Cal. Dep't of Parks & Recreation*, 14 Cal. App. 5th 75, 92 (2018) ("A mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under the FEHA." (cleaned up)).
- Landers' failure to give Sanders and Levels notice about the purpose of the meeting during which they were given notices of intended termination. The lack

    of notice did not alter the terms and conditions of Sanders and Levels' employment independently their terminations. (Dkt. No. 167 ("Landers Decl.") at ¶ 13.)

- The District's alleged failure to discuss Sanders' and Levels' complaints and their concerns about the audit. As to the failure to discuss the audit, that did not itself alter the terms and conditions of their employment. As to the failure to discuss Sanders' and Levels' complaints, the District has introduced evidence that it in fact investigated the complaints, and Sanders and Levels offer no nonconclusory evidence to the contrary. (*E.g.*, Dkt. No. 170 at ¶¶ 11–16; Levels Dep. at 25–29, 75–77.) Even if the District's investigation did not yield the results that Sanders and Levels had hoped for, the District's failure to explicitly respond to or discuss their complaints does not amount to an adverse employment action. *See Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000).

However, a reasonable jury could find that the following actions did constitute adverse actions, in addition to Sanders' and Levels' terminations:

- Replacing Sanders with Chiladakis on every important human resource matter at the District—including executive recruitments, the coordination of performance audits, and supporting his supervisors on HR matters—and shutting down Levels' primary project, which was her work with Illumyx on the District's Culture Initiative. Such acts constitute reductions in material job responsibilities, which are prototypical adverse actions. *Cozzi*, 787 F. Supp. 2d at 1061.
- The District's exclusion of Levels from meetings. That constitutes an adverse action because it "prevented her from discussing work matters" needed for her job. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008).
- The District's decisions to commence the performance audit of the HR department and subsequently place Sanders and Levels on administrative leave. While a closer call, a reasonable jury could find both actions were "adverse"

5

because they materially affected the terms and conditions of Sanders' and Levels' employment. To be sure, investigation and paid administrative leave "without actual termination are not considered adverse employment actions." *Longmire v. City of Oakland*, No. C 10-01465 JSW, 2011 WL 5520958, at *5 (N.D. Cal. Nov. 14, 2011), *aff'd*, 584 F. App'x 623 (9th Cir. 2014). Here, however, Sanders and Levels were terminated as a direct consequence of the District's decisions to commence the audit against the HR department and place them on paid administrative leave. Sanders and Levels have proffered evidence suggesting that even if the audit was supposedly directed at the entirety of the HR department, its results placed blame for the HR department's shortcomings squarely on Sanders and Levels while absolving other involved individuals of responsibility. (*E.g.*, Dkt. No. 182-4 at 11.) Furthermore, the District's stated justification for placing Sanders and Levels on administrative leave was to give the District time to investigate the audit's findings and consider whether the findings warranted further action. (Landers Decl. at ¶ 13; Dkt. Nos. 167-2; 167-3.) Lastly, the decisions to terminate Sanders and Levels by Landers and Philip Fine (who became the Air Pollution Control Officer after Landers) were finalized based in large part on the results of the audit. (Landers Decl. at ¶ 19 ("Based upon these audit findings which are detailed in the NOIT and my experience working with Mr. Sanders, I made the decision to terminate his employment and approved and signed the NOIT."); Dkt. No. 178-3 ("Fine Dep.") at 36 ("I had the auditor's report. I had the—the intent to terminate, and I had Ms. Levels's response at that time.").)

Having met the first three requirements of their prima facie case of discrimination, Sanders and Levels have also raised a material dispute of fact as to whether similarly situated employees outside their protected classes were treated more favorably. Sanders and Levels argue that Chiladakis and Judy Yu, a manager in the HR department, were similarly situated to

6

them, but their performance was not found lacking in the audit. The comparisons are apt. Chiladakis took over Sanders' position as CAO while Sanders was on medical leave and occupied that role for a substantial part of the timeframe the HR audit covered. (Dkt. No. 168 at ¶¶ 3–7.) And Yu, despite initially being Levels' supervisor and manager, became Levels' peer when Levels was promoted to the Human Resources Officer position, and the two performed similar functions in the HR department. (Doc. Nos. 174-1 ("Levels Decl.") at ¶ 7; 174-17 at 7.)

  Moreover, a reasonable jury could find based on the evidence presented that Chiladakis and Yu were both to blame for significant components of the conduct at issue in the HR audit that ultimately caused Sanders and Levels to be fired, but were never punished. For example, the HR audit identified that Sanders and Levels had improperly raised the salary of Adan Schwartz, Acting General Counsel at the District. (*See* Dkt. Nos. 167-6 at 8; 167-7 at 8–9.). However, Sanders and Levels asserted in their declarations that Chiladakis improperly increased Schwartz's salary and concealed that he had done so to the Human Resources Office. (Levels Decl. at ¶ 17; Sanders Decl. at ¶ 62.) Moreover, while the results of the audit stated that Sanders and Levels had hired additional employees in violation of an explicit Board direction (*see* Dkt. Nos. 167-6 at 13; 167-7 at 13–14), Sanders and Levels both represented in their declarations that others, including Chiladakis, were responsible for the filling of those positions (Levels Decl. at ¶ 17; Sanders Decl. at ¶ 65.). The audit also faulted Levels for failing to timely complete performance evaluations (Dkt. No. 167-7 at 12), but Levels indicated in her declaration that the issue existed while Yu was the manager of HR and that she had in fact increased the rate at which performance evaluations were completed. (Levels Decl. at ¶ 43). Yet, the evidence in the record would support a reasonable inference that Chiladakis and Yu were not punished at all for their deficiencies. (*E.g.*, Levels Decl. at ¶¶ 17, 43; Sanders Decl. at ¶ 77.) In sum, a reasonable jury could conclude that Chiladakis and Yu were not punished for the very actions that led to Sanders' and Levels' termination. That is sufficient to create a genuine dispute of material fact as to Sanders' and Levels' prima facie discrimination case arising from their terminations.

The burden then shifts to the District to demonstrate nondiscriminatory reasons for the adverse actions taken against Sanders and Levels. Because the District does not point to evidence of nondiscriminatory reasons for the adverse employment actions it took against Sanders and Levels besides terminating them, summary judgment is denied as to Sanders' sexual orientation discrimination and Levels' race and sex discrimination claims arising from those other adverse actions. As to Sanders' and Levels' terminations, the District argues that it had legitimate business reasons for terminating Sanders and Levels due to the performance deficiencies revealed by the audit. (Motion at 36.)

Sanders and Levels then have the burden to show that the District's reason for terminating them was pretextual and that the true reason for their termination was discrimination. In making that showing, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). In such a case, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*. at 147.

Sanders and Levels present a genuine dispute of material fact as to whether the audit was pretextual and used to generate an excuse to fire them. As noted above, Sanders and Levels point to evidence that they were faulted for filling certain positions against the Board's wishes and increasing the salary of Schwartz, when in fact those actions were taken by Chiladakis. Moreover, Sanders and Levels present evidence from which a reasonable jury could conclude that Chiladakis—who Sanders and Levels both allege discriminated against them during their employment at the District—interfered with the audit. Chiladakis maintains that he corresponded with the lead auditor, George Skiles, solely as a liaison and provided logistical support regarding information, documents, and other materials that Skiles requested. (Dkt. No. 168 at ¶¶ 8–9.) Sanders and Levels, however, have pointed to text messages between Chiladakis and Skiles that could reasonably support an inference that Chiladakis voluntarily offered Skiles information specifically targeting Sanders and Levels while concealing his role in the conduct at

issue.  (Levels Decl. at ¶ 19; Sanders Decl. at ¶ 37; 174-39 (texts between Chiladakis and Skiles wherein Chiladakis indicates he has "thoughts" about the "FYE 22 vacancies").)  Chiladakis counters that these text messages demonstrate his "friendly and professional relationship" with Skiles and do not demonstrate that he provided Skiles "suggestions as to how the audit should be conducted or as to what conclusions should be reached," (Dkt. No. 168 ¶ 10), but this represents a factual dispute that precludes summary judgment.  If Chiladakis misrepresented his involvement in the audit, a reasonable jury could conclude that his false explanation was generated to cover up his discriminatory purpose in biasing the audit against Sanders and Levels.  *Cf. Reeves*, 530 U.S. at 147.

      Levels has offered additional evidence from which a reasonable jury could infer that Chiladakis harbored discriminatory animus against her based on her race and gender.  Levels points to deposition testimony from Dr. Andrew Fleck, Chief Behavior Scientist of Illumyx, in which he testified that while working with Chiladakis, Chiladakis stated that he "had a bias against women in management roles."  (Dkt. No. 174-43 at 9.)  According to Fleck, Chiladakis would also "make offhanded remarks" about women in management roles "using terms like naïve, inexperienced, doesn't know what she's talking about, wouldn't be familiar with the context or wouldn't know anything about that."  (*Id.*)  Levels also points to letters Illumyx sent to Broadbent and Santa Clara County Board Chair Cindy Chavez.  (Dkt. Nos. 174-22 at 1; 174-23 at 11.).  The letter to Chavez states that Chiladakis was regularly "dismissive and derisive" of Levels, calling her "naïve and inexperienced" despite "her having more years of HR/OD knowledge, education, or experience, as well as direct experience in another culture initiative and her being the most qualified to lead it internally."  (Dkt. No. 174-23 at 12.)  The letter additionally reports that Chiladakis "showed similar disdain for Veronica Eady, [another Black female employee,] . . . saying she too was 'naïve' and 'doesn't have a clue as to what really goes on around here.'"  (*Id.*)  A reasonable jury could conclude based on this evidence that Chiladakis harbored discriminatory animus against Levels because of her race and gender.

9

Furthermore, a reasonable jury could conclude that Chiladakis' discriminatory motive infected the ultimate termination decision. Under the cat's paw theory, the discriminatory intent of a subordinate employee can be imputed to a final decisionmaker if the decisionmaker "acted as the conduit of [the employee's] prejudice—his cats paw"—despite the "innocence of the decisionmaker." *Martin v. Bd. of Trs. of Cal. State Univ.*, 97 Cal. App. 5th 149, 169 (2023) (cleaned up) (quoting *Reid v. Google, Inc.*, 50 Cal. 4th 512, 542 (2010)). *See generally Amador v. SBE Ent. Grp., LLC*, No. 19-CV-06414-WHO, 2021 WL 2936735, at *13 n.8 (N.D. Cal. July 13, 2021). To support this theory, a plaintiff "must proffer evidence that a significant participant in an employment decision exhibited discriminatory animus." *Martin*, 97 Cal. App. 5th at 169 (citation omitted). Sanders and Levels have adduced sufficient evidence to support a reasonable inference that Landers and Fine were conduits of Chiladakis' discriminatory animus, therefore allowing Chiladakis' discriminatory motivation to be imputed to them. *See id*. As described above, both Landers and Fine stated that the HR audit played a significant role their decisions to terminate Sanders and Levels. Fine also testified that he did not do any investigation into the correctness of the audit's findings and conclusions and that he consulted Chiladakis when deciding to terminate Levels. (Fine Dep. at 24, 37). And in Landers' termination letter to Sanders, Landers justified her decision using direct quotations from the audit outlining performance deficiencies it attributed to Sanders, deficiencies Sanders contends would have been attributed to Chiladakis had he not hid his responsibility for them. (*See* Dkt. No. 167-6 at 3–4.) Because Sanders and Levels have presented evidence from which a reasonable jury could conclude (a) that Chiladakis played a substantial role in biasing the audit against them and (b) that he played a significant role in Landers' and Fine's decisions to terminate them, a reasonable jury could find that Chiladakis' discriminatory motive can be imputed to Landers and Fine. This demonstrates a genuine dispute of material fact going to whether the District's purportedly nondiscriminatory reason for firing Sanders and Levels was pretextual.

For the foregoing reasons, summary judgment is therefore **DENIED** as to Sanders' sexual orientation discrimination claim and Levels' race and gender discrimination claims.

*Failure-to-Prevent-Discrimination Claims.*  Accordingly, the Court **GRANTS** the District's motion for summary judgment as to Sanders' failure-to-prevent-gender-identity discrimination claim and **DENIES** the District's motion for summary judgment as to their remaining failure-to-prevent claims, which are based on the same arguments discussed above as to the discrimination claims.  *See Achal*, 114 F. Supp.3d at 804.

*Hostile Work Environment Claims.*  Summary judgment is **GRANTED** as to Sanders' and Levels' hostile work environment claims, which are time-barred.  A plaintiff pursuing a FEHA claim must file an administrative charge with the California Civil Rights Department within three years of the date on which the unlawful practice occurred.  Cal. Gov. Code § 12960(e)(5).  Under the continuing violations doctrine, courts can consider alleged unlawful behavior that would be time-barred so long as it is part of a continuing course of unlawful conduct in which at least one act occurs within the statutory time period.  *Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1092–93 (N.D. Cal. 2008).  To establish a continuing violation for purposes of FEHA, a plaintiff "must show that the employer's actions were (1) sufficiently similar in kind; (2) have occurred with reasonable frequency; and (3) have not acquired a degree of permanence."  *Id*. at 1093 (cleaned up).

Sanders and Levels filed their administrative charges with the California Civil Rights Department on June 26, 2023, and June 29, 2023, respectively.  (Dkt. Nos. 103-2, 103-4.)  Therefore, Sanders and Levels cannot pursue claims arising from acts that took place before June 26, 2020, and June 29, 2020, respectively, unless the continuing violations doctrine applies.  However, as confirmed at the hearing for this motion, Sanders and Levels have offered no evidence pertaining to sufficiently similar harassing acts against them specifically that occurred after October 2020 with reasonable frequency.  The continuing violations doctrine is therefore inapplicable, and Sanders and Levels' undated allegations are insufficient to raise a material dispute of fact on summary judgment.  The Court therefore **GRANTS** summary judgment in favor of the District as to Sanders' and Levels' hostile work environment claims.

***Retaliation Claims.***  Retaliation claims under both FEHA and Title VII are analyzed under the *McDonnell Douglas* framework. *Moses v. Aerotek, Inc.*, No. 17-CV-06251-BLF, 2021 WL 1643221, at *4 (N.D. Cal. Apr. 27, 2021).  Plaintiffs bringing retaliation claims under either statute must therefore show (1) that they engaged in a protected activity, (2) the employer subjected them to an adverse employment action, and (3) a causal link existed between the protected activity and the adverse employment action.  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005).  Once this prima facie case is established, the employer must offer a "legitimate, nonretaliatory reason for the adverse employment action."  *Id*.  If the employer is able to do so, "the burden shifts back to the employee" to prove that the nonretaliatory reason was pretextual.  *Id*.

As to the first prong, under FEHA, "an employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA."  *Id*. at 1043.  Indeed, "[t]he relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner."  *Husman v. Toyota Motor Credit Corp.*, 12 Cal. App. 5th 1168, 1193 (2017).  Similarly, under Title VII, "internal complaints constitute protected activity when a reasonable person would believe the conduct the complaint reports violates Title VII."  *Equal Emp. Opportunity Comm'n v. Tesla, Inc.*, 727 F. Supp. 3d 875, 893–94 (N.D. Cal. 2024).

As to the second prong, retaliation claims involve a more capacious understanding of what constitutes an "adverse action."  In the retaliation context, adverse action "requires a showing that a reasonable employee would have found the challenged action materially adverse, meaning it might well have dissuaded a reasonable worker from making or supporting a charge

of discrimination." *Lelaind*, 576 F. Supp. 2d at 1097 (citation omitted).  Furthermore, "[w]hen a plaintiff alleges a series of actions that comprise a course of conduct, [the court] need not examine each individually.  Instead, [the court] consider[s] the totality of the circumstances to determine whether the plaintiff has suffered an adverse employment action." *Light*, 14 Cal. App. 5th at 92.

Finally, as to the third prong, the requisite "causal link" between the employee's protected activity and the adverse employment action can be established by direct or circumstantial evidence.  *See Lee v. Eden Med. Ctr.*, 690 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010).  To infer causation from temporal proximity alone, the time between an employer's knowledge of protected activity and the adverse employment action must be "very close."  *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam).  However, causation is not "dependent, as a matter of law, on temporal proximity."  *Porter v. California Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005).  Indeed, a causal connection can also be inferred from "circumstantial evidence of a 'pattern of antagonism' following the protected conduct."  *Id*. (quoting *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3rd Cir. 1997)).

Material disputes of fact preclude summary judgment on Sanders' and Levels' retaliation claims.  Both Sanders and Levels have established their prima facie cases for retaliation. Sanders spoke with Chavez on or about August 24, 2021.  (Sanders Decl. at ¶ 31.)  He stated his declaration that Chavez's assistant referred to him as a "whistleblower" when setting up the meeting.  (*Id*.)  During the conversation, Sanders discussed his "written complaint and concerns regarding the discriminatory and toxic culture" at the District, (*id*.), specifically explaining that the "behaviors that had happened" to him, and the mistreatment of women and people of color including Levels, made him suspect that "there was discriminatory animus going on" (Sanders Dep. at 128).  However, after Sanders met with Chavez, the Board cut off all communications with him (despite promising him further correspondence within a few weeks), the District commenced the audit that could reasonably be viewed as pretextual in December 2021, and the District eventually gave him notice of its intent to terminate him in December 2022.  (*Id*. at 135;

Sanders Decl. at ¶¶ 31–33, 48.)  Sanders' conversation with Chavez constitutes protected activity because it "sufficiently convey[ed]" that he was complaining about unlawful discriminatory conduct affecting him and others at the District, including Levels.  *See Husman*, 12 Cal. App. 5th at 1193.  Moreover, the Board's decision to cut off communication with him, and then to commence an audit that could reasonably be viewed as pretextual and that culminated in the District's ultimate decision to terminate him, can reasonably be found to constitute adverse employment actions because they would dissuade a reasonable worker from making or supporting a charge of discrimination.  *See Lelaind*, 576 F. Supp. 2d at 1097.

To be sure, Sanders' conversation with Chavez occurred more than a year prior to his termination, which when considered alone might be insufficient to support an inference of a causal connection between the two.  However, Sanders has adduced additional evidence sufficient to support a "pattern of antagonism" that commenced shortly after his conversation with Chavez: the Board's cutting off communications with him, initiation of the arguably pretextual audit against him, and termination of his employment.  *See Porter*, 419 F.3d at 895 ("Moreover, Porter does not rely on 'mere temporal proximity,' but offers other evidence to support the inference of a retaliatory motive.") (citation omitted)).  Considered as a whole, the evidence Sanders proffered could permit a reasonable jury to conclude that the District's treatment of him following his call with Chavez had a retaliatory motive.

Similarly, Levels has also established her prima facie case of retaliation.  In her declaration, Levels stated that while she was reporting to Chiladakis, she raised concerns to Broadbent in 2021 about the way Chiladakis treated her and others.  (Levels Decl. at ¶ 14.)  Specifically, she averred that she recounted to Broadbent specific acts by Chiladakis that she believed constituted sex and race discrimination.  These acts included denigrating her to Illumyx, causing the Illumyx project to be shut down, excluding her from meetings she needed to attend for her work, and mistreating another Black female employee, Veronica Eady.  (Levels Dep. at 28, 74; Levels Decl. at ¶ 15.)  Levels also stated that Broadbent told Chiladakis about Levels' complaint, which led to Chiladakis confronting Levels about her concerns and treating her

14

worse. (Levels Dep. at 29–30.) Lastly, as described above, Sanders and Levels have introduced evidence suggesting that Chiladakis fed Skiles information targeting Levels specifically while obfuscating his own role in the HR department's shortcomings, which biased the audit against her.

This makes out a prima facie case of retaliation. Levels' complaints to Broadbent constitute protected activity because her descriptions of Chiladakis' alleged mistreatment of Black women and observations that he did not treat others in the same way sufficiently conveyed her concerns that Chiladakis was acting in an unlawful discriminatory manner. (Levels Decl. at ¶ 15.) Furthermore, Chiladakis' confronting of Levels, his treating her worse, and his influencing of the audit, considered as a whole, constitute an adverse employment action that would dissuade a reasonable worker from raising a charge of discrimination. *Light*, 14 Cal. App. 5th at 92. The evidence supporting Levels' allegations regarding Chiladakis' interconnected actions following her complaint to Broadbent also gives rise to an inference that there was a causal connection between those actions and Levels' protected activity, even if the time between them would alone be insufficient to support an inference of discriminatory motive. *See Porter*, 419 F.3d at 895.

Because Sanders and Levels have established sufficient evidence of their prima facie case, the question then becomes whether the District's asserted legitimate business reason for terminating Sanders and Levels was pretextual. For the reasons described above, Sanders and Levels have established a material dispute of fact as to that issue. Therefore, summary judgment as to Sanders' and Levels' retaliation claims is **DENIED**.

*Conclusion.* For the foregoing reasons, summary judgment is **GRANTED** as to Sanders' and Levels' hostile work environment claims and Sanders' gender identity discrimination and failure-to-prevent-gender-identity-discrimination claims. Additionally, summary adjudication is **GRANTED** as to Sanders' and Levels' discrimination and failure-to-prevent claims to the extent they are based on the following alleged adverse actions: derogatory statements, false performance accusations, and rumors about Sanders and Levels; Landers' failure to give Sanders

and Levels notice about the purpose of the meeting during which they were given notices of intended termination; and the District's alleged failure to discuss Sanders' and Levels' complaints and their concerns about the audit.  Summary judgment as **DENIED** as to Sanders' and Levels' remaining claims.

**IT IS SO ORDERED.**

Dated: October 30, 2025

RITA F. LIN
United States District Judge